UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) No. 2:13-CR-64 |
| | ) |
| CECIL WAYNE GREGG | ) |

# REPORT AND RECOMMENDATION

Defendant is indicted for being a convicted felon in possession of a firearm. According to the indictment, the firearm which defendant possessed was a 12 gauge shotgun. That shotgun was seized by officers of the Washington County Sheriff's Department in the late evening hours of December 17, 2012 from defendant's home. Defendant has filed a motion to suppress evidence of that firearm (Doc. 22), claiming that the officers had no search warrant and neither did they have consent to search. A hearing was held on June 17, 2014.

Based upon the evidence presented during the hearing, the facts are as follows:

Around 10 p.m. on December 17, 2012, an individual named Kenneth Chisholm called the 911 dispatcher in Washington County to report that someone was shooting a firearm at or near his house. The 911 dispatcher in turn contacted deputy Robert Warf, indicating that a citizen had made a "shots fired" report.

Deputy Warf and deputy Seth Cassel responded to Mr. Chisholm's residence. Chisholm reported to the deputies that when he and his infant son pulled up into his driveway, he heard gunfire and pellets raining down on his house and in his trees. He told

the deputies that the shots had come from the house "above and behind" Chisholm's house, which was the house in which the defendant resided with his long-time female companion, Sharma Baines.

The two deputies, in their separate cars, drove to defendant's residence at 186 Greggstown Road. The deputies' shift supervisor, Lieutenant Edwin Graybeal III, heard the radio dispatch of "shots fired," and in conformance with his customary practice in such situations, he too drove to defendant's residence.

Deputy Warf knocked on the door. Defendant and Ms. Baines were in bed; Ms. Baines was quite ill, probably with the flu. She prevailed upon defendant to answer the door.

Defendant answered the door, dressed only in house shoes and "long john underwear, with no shirt.

The officers told defendant they were there to investigate a complaint that shots had been fired at Chisholm's house from that location. Defendant freely acknowledged that *someone* had fired a shotgun at a raccoon who had been raiding and killing defendant's roosters.[1] Defendant took the officers some distance out into the yard and showed them an area in the dirt where the shotgun pellets had hit.

Lieutenant Graybeal had known defendant for 34 years, and he knew defendant's criminal history (which is extensive, by anyone's standard), and that he was a convicted felon. Lieutenant Graybeal knew that defendant could not legally possess a firearm.

---

[1] There was testimony that defendant acknowledged firing a shotgun at the marauding raccoon, and there was testimony that it was a friend of defendant who fired the shot(s). Who actually fired the shots is irrelevant to the suppression issue.

2

It was late at night, and the weather was cold and damp. Defendant, dressed as he was, understandably wanted to go back into his house. One of the deputies told defendant that they would have to accompany him into his house for the sake of the officers' safety in view of the report of shots having been fired.

The door through which the deputies, Lieutenant Graybeal, and defendant entered the house opened directly into the kitchen, and that is where all four men stopped. Shortly thereafter, Lieutenant Graybeal returned to his cruiser to contact his dispatcher to obtain confirmation that defendant indeed was a convicted felon.

As mentioned, Ms. Baines was quite ill, and she was in her bed when the officers entered the kitchen. However, she shortly arose and walked into the hallway that connected the kitchen and her bedroom. She spoke briefly to the officers, and then went into the bathroom.

As Ms. Baines was leaving the bathroom, Lieutenant Graybeal had just entered the kitchen after talking to his dispatcher. Rather than stopping in the kitchen, Lieutenant Graybeal passed the two deputies and defendant in the kitchen, and walked down a hallway to talk to Ms. Baines.

It is at this point that the testimony of Ms. Baines and Lieutenant Graybeal diverge to some degree. Graybeal testified that he walked up to Ms. Baines and asked her if he could talk to her a moment, and she agreed; that he asked her if there were any guns in the house, and she answered there were; that he asked her where the guns were, and she responded that they were in the bedroom; that he asked if she would allow him to look in the bedroom, and

3

that Ms. Baines consented that he could do so. According to Graybeal, he went into the bedroom and immediately saw a wooden gun cabinet with a glass door, through which he could see the shotgun which is described in the indictment. He also observed a hunting vest containing shotgun shells and some .22 caliber ammunition.

Ms. Baines' version differs in one significant respect: although she agrees with Graybeal that he asked her if there were guns in the house, she steadfastly insists that he never asked her permission to search. For reasons discussed later, whether or not Ms. Baines consented is irrelevant.

For his part, defendant testified that as Graybeal walked past him in the kitchen and down the hallway to talk to Ms. Baines, defendant asked Graybeal, "Don't you need a warrant to do that?" Again, as discussed later in this report and recommendation, whether defendant made this statement or not is irrelevant.

The attorneys understandably devoted a great deal of time and argument to the Supreme Court cases of *Georgia v. Randolph*, 547 U.S. 103 (2006) and *Fernandez v. California*, _____ U.S. _____, 134 S.Ct. 1126 (2014). These cases involve the efficacy of a consent to search a defendant's residence given by a co-owner of that residence. It has long been the law that a third party with apparent authority over a premises may validly consent to its search. The *Randolph* case somewhat limited the scope of that principle by holding that a co-tenant's consent is not valid if the defendant is physically present and objects to the search.

The *Fernandez* case, decided eight years after *Randolph*, holds that the defendant's

4

objection will trump the consent of the other co-owner only if the defendant is physically present. If he is absent for any reason, even if he is arrested and removed from the premises so that he no longer is present and able to voice his objection, he nevertheless loses his right to object to the search, and the consent of the co-owner is valid.

Defendant clearly was present, and although he insists that he obliquely objected to Graybeal's search ( by his question to Graybell about the need for a warrant), it really is not necessary to decide that controverted fact. Neither is it necessary to decide if Ms. Baines actually consented for Graybeal to enter the bedroom. Even if she did consent, her consent was not valid.

These three officers were lawfully in defendant's kitchen: Defendant was not dressed for the weather, he asked to go inside, and the officers lawfully accompanied him for their own safety. However, their lawful presence in the house did not extend to any part of the house apart from the kitchen. Defendant never asked to go anyplace else in the house, and in fact he did not go anyplace else; he remained in the kitchen the entire time. Any additional penetration into the house by an officer was beyond the area necessary for officer safety since defendant remained in the kitchen. When Graybeal walked through the kitchen and down the hallway, he went some 20 feet beyond the kitchen. That additional penetration was no more lawful than if they had illegally entered the house itself. To be sure, 20 feet is a short distance, but it nevertheless was well outside the kitchen. If an extra 20 feet was permissible, how much would have been too much? For example, could Lieutenant Graybeal have opened the bathroom door and talked to Ms. Baines while she was in there? After she

5

came out of the bathroom, could he have followed her into her bedroom and in there asked her about guns in the house? To repeat, *any* entry into the house beyond the kitchen area itself was impermissible under the Fourth Amendment.

Neither could Lt. Graybeal's actions in going down the hall have been justified for safety reasons. Defendant was in the kitchen, in the presence of the two deputies who were there to see that he did not wander through the house and perhaps retrieve the shotgun or another weapon. This is rather analogous to the situation in *Chimel v. California*, 395 U.S. 752 (1969) which stated:

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the arrestee latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a similar rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence. There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well recognized exceptions, may be made only under the authority of a search warrant. The "adherence to judicial processes" mandated by the Fourth Amendment requires no less.

*Id.*, at 762-63.

It follows that Lieutenant Graybeal's questions to Ms. Baines and her answers, followed an illegal entry.

> When an individual consents to a search after an illegal entry is made, the consent is not valid and "suppression is required of any items seized during the search…, unless the taint of the initial entry has been dissipated before the

'consents' to search were given." *Buchanan*, 904 F.2d at 356 (quoting *United States v. Vasquez*, 638 F.2d 507, 527 (2d Cir. 1980), cert. Denied, 450 U.S. 970, 101 S.Ct. 1490, 67 L.Ed.2d 620 (1981)). "Dissipation of the taint resulting from an illegal entry," this Court has held, "ordinarily involves showing that there was some significant intervening time, space, or event." *Id*. (Quoting *Vasquez*, 638 F.2d at 528). Finally, it is the government's burden to show that the defendant's consent "was *sufficiently* an act of free will to purge the primary taint of the unlawful invasion." *Buchanan*, 904 F.2d at 356.

*U.S. v. Chambers*, 395 F.3d 563, 569-70 (6th Cir. 2005).

The taint of Lieutenant Graybeal's illegal entry had not "dissipated." He *immediately* entered the bedroom and saw the gun cabinet and its contents. To the extent the government was required to prove that Ms. Baines' consent (if in fact she gave it) "'was *sufficiently* an act of free will to purge the primary taint of the unlawful invasion'" it did not do so; all the witnesses agreed that Ms. Baines was extremely ill that evening.

**CONCLUSION**

By leaving the kitchen area to talk to Ms. Baines, Lieutenant Graybeal illegally entered the residence of Ms. Baines and defendant. Any consent thereafter obtained by Lieutenant Graybeal was invalid as a result. Therefore, it is recommended that defendant's motion to suppress, Doc. 22, be granted.[2]

Respectfully submitted,

       s/ Dennis H. Inman
       United States Magistrate Judge

---

[2] Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1).