UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

UNITED STATES OF AMERICA   )
            )
v.            )  No.  2:13-CR-064
            )
CECIL WAYNE GREGG    )

**MEMORANDUM AND ORDER**

The defendant is charged with being a felon in possession of a firearm. He has filed a motion to suppress a Conquest, Model MKV Germany, 12 gauge shotgun discovered during an allegedly unlawful search of his home, along with "any statements made . . . before, during, or after the search." [Doc. 22].  The United States has responded in opposition to the motion, and the defendant has filed a reply.  [Docs. 27, 29].

Chief United States Magistrate Judge Dennis H. Inman held an evidentiary hearing on June 17, 2014.  The magistrate judge heard testimony from Deputies Robert Warf and Seth Castle, Lieutenant Edwin Graybeal, III, Sharma Baines, and the defendant.

Now before the court is the magistrate judge's June 19, 2014 report and recommendation ("R&R"), recommending that the defendant's motion be granted. [Doc. 34].  The United States objects to the R&R.  [Doc. 37].  The defendant has

responded to the objection, the government has filed a reply, and the defendant has filed an additional response. [Docs. 38-40].

The court has carefully reviewed and considered the transcript of the motion hearing [doc. 36], along with the arguments presented by the parties. For the reasons that follow, the United States' objection will be overruled.

*I.*

*Standard of Review*

A district court is both statutorily and constitutionally required to conduct a *de novo* review of a magistrate judge's report and recommendation. *See United States v. Shami*, 754 F.2d 670, 672 (6th Cir. 1985). However, it is necessary only to review "those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). The district court need not provide *de novo* review where objections to a report and recommendation are frivolous, conclusive, or general. *See Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986).

*II.*

*Relevant Background*

The pertinent facts are accurately set forth by the magistrate judge in his R&R and need not be restated at length. To briefly summarize, Deputies Warf and Castle, along with Lt. Graybeal, went to the defendant's home in December 2012 in response to a neighbor's "shots fired" complaint. The officers initially spoke with the defendant outside the home. Due to the cold weather, the deputies eventually

accompanied the defendant just inside the kitchen while Lt. Graybeal verified the defendant's criminal history by telephone from outside. Lieutenant Graybeal later entered the residence through the kitchen door and allegedly obtained consent from co-occupant Baines to search for a shotgun, which he did in fact locate. Magistrate Judge Inman concluded that "[b]y leaving the kitchen area to talk to Ms. Baines, Lieutenant Graybeal illegally entered the residence of Ms. Baines and defendant [without consent]. Any consent thereafter obtained by Lieutenant Graybeal was invalid as a result." [Doc. 34, p.7].

*III.*

*Analysis*

A. Location of Lt. Graybeal's Encounter with Ms. Baines

The magistrate judge found that Lt. Graybeal "went some 20 feet beyond the kitchen" (or "down the hallway") to talk to Ms. Baines. [Doc. 34, p.5]. The government objects to this finding, arguing that "it was approximately 20 feet from the entry door to the bathroom, not from the kitchen to the bathroom." [Doc. 37, p.3].

The defendant's residence is not large - approximately 40 feet long. [Doc. 36, p.16]. Regardless of the size, by the government's own version of the facts as presented in its objection, Lt. Graybeal walked halfway into the home without a search warrant or consent. Further, both deputies testified that from the kitchen they were too far away to hear Baines and Graybeal's conversation, although the defendant testified that he could hear it. [*Id.*, p.16, 22, 28-29, 36, 84, 90]. According to Deputy Warf, he,

3

Deputy Castle, and the defendant were still "at the door" when Lt. Graybeal reentered the home. [*Id.*, p.16].

Deputy Castle described Ms. Baines' location as "towards the back of the residence" [*id.*, p.28, 36], and Lt. Graybeal could not "recall where she was at in the house." [*Id.*, p.43]. When asked whether the conversation took place "right outside the bathroom door," Lt. Graybeal answered, "Yeah, between the kitchen and the bedroom." [*Id.*, p.60]. Ms. Baines testified that the encounter took place "right outside the bathroom door" in "about the middle of the house." [*Id.*, p. 66-67].

On the facts of this case, it is of little consequence to the court whether 20 feet marks the distance from *the kitchen* to the encounter or from *the outside kitchen door* to the encounter. There is strong evidence that Lt. Graybeal entered at least into the middle of the home with neither consent nor a search warrant. It is that fact that matters.

### B. Consent

The magistrate judge was presented with a question of *consent*. The suppression motion argues "that the firearm was seized without a search warrant and *without effective consent*." [Doc. 22, p.1] (emphasis added). The government's response concluded that, "Because the officers here received voluntary *consent* to search the residence, . . . the defendant's motion to suppress evidence obtained *as a result of a consent search* must be denied." [Doc. 27, p.3] (emphasis added). The defendant replied that "the search and seizure were illegal based on law enforcement officers' activities in searching and making an entry to the house *prior to any consent*. Mr. Gregg also asserts

4

that *any consent was not valid . . . .*" [Doc. 29, p.1] (emphasis added). Understandably

then, the R&R largely focuses on the issue of consent.

> Generally, whether consent to a search was voluntarily given is a question
> of fact. The government has the burden of showing that consent was not
> contaminated by any duress, coercion, or trickery. Whether a consent has
> been freely and voluntarily given must be determined from the totality of
> all the circumstances. . . .
>
> . . .
>
> The consequence of an illegal entry is to make unlawful any ensuing
> interrogations or searches . . . . [S]uppression is required of any items
> seized during the search of the house, unless the taint of the initial entry has
> been dissipated before the 'consents' to search were given. Dissipation of
> the taint resulting from an illegal entry ordinarily involves showing that
> there was some significant intervening time, space, or event.

*United States v. Buchanan*, 904 F.2d 349, 355-56 (6th Cir. 1990) (citations and

quotations omitted).

Magistrate Judge Inman correctly concluded that Lt. Graybeal's entry into

the middle of the home was unlawful. The United States has cited no authority, or made

any meaningful argument, to the contrary. As such, Ms. Baines' subsequent consent to

search (presuming such consent was given) was invalid. The government has not met its

burden of showing dissipation of the taint of the illegal entry into the middle of the home.

The entry and consent were only moments apart. There was no significant intervention

of space or other event. There is no error in the magistrate judge's recommendation.

## C. Protective Sweep

Although neither party had raised the issue, Magistrate Judge Inman nonetheless addressed whether Lt. Graybeal's entry could have been valid due to concerns over officer safety. The magistrate judge concluded, "Neither could Lt. Graybeal's actions in going down the hall have been justified for safety reasons. Defendant was in the kitchen, in the presence of the two deputies who were there to see that he did not wander through the house and perhaps retrieve the shotgun or another weapon." [Doc. 34, p.6].

Now, for the first time, the United States objects that Lt. Graybeal was in fact conducting a protective sweep of the residence to ensure officer safety. The court finds it necessary to quote the United States' position at some length:

> In *Maryland v. Buie*, 494 U.S. 325, 330 (1990), the Court held that officers may, "without probable cause or reasonable suspicion, look in closets and other spaces adjoining the place of arrest from which an attack could be immediately launched." The Court further held that officers may conduct a sweep beyond those areas under certain circumstances. *Id.* . . .

> The situation here is analogous to that addressed in *United States v. Bass*, 315 F.3d 561 (6th Cir. 2002), wherein officers also responded to a shots fired call. . . . [T]he court went on to the issue pertinent to this case, and held that the sweep and seizure of the weapon were appropriate. *Id.* at 564. The court explained that the officers were not sure the defendant was the shooter they were seeking, and therefore the search was justified. *Id.* Similarly, the officers here only knew that the shots had been fired from the direction of the defendant's residence. The officers were presented with conflicting stories about the shooter and location of the firearm. Therefore, the officers had reason to do a protective sweep of the residence.

Clearly, the officers here had reason to believe that there was a danger posed to them and others on the scene. The officers knew that there were, at least, three parties present in the home apart from the officers. The officers were present due to the allegation that shots had been fired in the direction of the complainant's residence, allegations that, if true, supported the belief that a violent offense had occurred. The defendant indicated that a third party, one who was in the defendant's residence, possessed a shotgun, and had fired shots earlier that evening. Likewise, Lt. Graybeal was aware of the defendant's extensive violent criminal history. Finally, officers became aware of another person in the residence when she, Ms. Baines, exited the bedroom and approached officers in the kitchen. Thus, despite the Magistrate Judge's opinion that "[a]ny additional penetration into the house by an officer was beyond the area necessary for officer safety since the defendant remained in the kitchen," the residence was far from secure. At a minimum, the officers had reason to believe that two other parties were in the residence, perhaps more, and that there was at least one unaccounted for firearm somewhere in the residence. Thus, the safety of the officers and the others present in the residence was far from assured. Notably, Ms. Baines, who was ill, wished to return to her room to lie down, which she in fact did. It would have been folly on the officers' part to permit her to return to the room, knowing that a firearm was likely present. Accordingly, Lt. Graybeal was justified, under the authority of *Buie*[,] in conducting a sweep of the residence to safeguard those present therein.

[Doc. 37, p. 4-6].

The United States is indeed correct that arresting officers can, "as a precautionary measure and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie*, 494 U.S. at 334. Lieutenant Graybeal, however, went beyond the area immediately adjacent to the place of arrest – a fact that the government does not contest. To justify a protective sweep beyond the area adjacent to the arrest, the government must show "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in

7

believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* In this case, the government has come nowhere close to making that showing, offering instead what the defense accurately terms "a contorted and contrived view of the facts." [Doc. 38, p.1].

Again, to justify as a protective sweep Lt. Graybeal's entry to the bathroom door and on to the bedroom, it is the government's burden to show facts and reasonable inferences upon which a reasonable officer would feel "that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334. The court agrees that the officers' concerns regarding *the defendant* were valid. Although the deputies did not initially know that he was a convicted felon, Lt. Graybeal "definitely" did. [Doc. 36, p.7, 26, 50]. Lieutenant Graybeal "was familiar with the past history and felt like I needed to go up there and make sure that everything was okay" based on "past arrests and . . . other incidents that have occurred up there." [*Id.*, p.37-38]. Lieutenant Graybeal had known the defendant for 34 years and was aware that he had multiple aggravated assault convictions. [*Id.*, p.38, 40, 51].

According to all three officers, the defendant admitted early in their encounter that he owned a shotgun and/or that he had fired it at a raccoon. [*Id.*, p.7, 25, 40]. The deputies accompanied the defendant into the house through the kitchen door and both remained there with him. [*Id.*, p.8-9]. They "talked about his chickens and . . . a bunch of random stuff." [*Id.*, p.9, 30]. The deputies "weren't too far in[to] the kitchen," keeping the defendant in that room for "[o]fficer safety." [*Id.*, p.15, 58].

The testimony indicates that the officers felt they had the defendant under control. In contrast to the government's reference to "the belief that a violent offense had occurred," Deputy Castle accepted that the defendant had only been shooting at a raccoon rather than at another person. [*Id.*, p.30]. The defendant was not handcuffed or otherwise detained until the firearm was discovered. [*Id.*, p.29].

As to the officers' alleged safety concerns regarding other persons in the home, Deputy Warf's "attention wasn't focused on Ms. Baines." [*Id.*, p.16]. Lieutenant Graybeal testified that Ms. Baines appeared to have the flu, and he did not suspect her "at all" of having fired a gun. [*Id.*, p.56-57]. While the government theorizes that "[i]t would have been folly" for the officers to allow Ms. Baines to return to *her bedroom* "knowing that a firearm was likely present" in that room, no officer testified to having any actual concern with Baines going into *the bathroom* behind closed doors, where a firearm could just as likely have been hidden – a similar "folly" under the government's theory.

Next, the government contends that the third person in the home was Travis Sanders [doc. 37, p.2], whereas the defendant says it was Travis Ashberger. [Doc. 38, p.2]. Regardless, Lt. Graybeal testified that the third person "wasn't involved in it, so we didn't go any further with that with this gentleman. . . . He stayed in the living room area for the most part when we were there." [Doc. 36, p.41-42]. Neither deputy's testimony even mentioned the presence of a third party. Further, no officer testified to being concerned that a fourth or fifth person might have been present.

Additional facts prevent the court from concluding that a reasonably prudent officer would have "believ[ed] that the area to be swept harbor[ed] an individual posing a danger to those on the arrest scene." Lieutenant Graybeal testified that he was initially outside verifying the defendant's criminal history for more than ten minutes. [*Id.*, p.54]. If the officers indeed feared an unknown danger in the home, a protective sweep would have been conducted immediately. Similarly, during the period of at least ten minutes while Lt. Graybeal was outside, both deputies remained in the kitchen talking with the defendant. Neither deputy restrained or removed the defendant so that the other could conduct a protective sweep. These facts are completely inconsistent with the belief that the home contained an unknown and dangerous individual.

Lastly, the officers' testimony characterized the search as just that – a search. Deputy Castle testified that he and Deputy Warf stayed in the kitchen with the defendant "while Lieutenant Graybeal *was conducting his search*." [*Id.*, p. 30, 34] (emphasis added). Lieutenant Graybeal testified that he approached Ms. Baines "and asked her if I could talk to her for a minute; and at that point, that's when I asked her if there were any guns in the house . . . and at that point I asked her if I could go look for the guns in the bedroom, if I could search the bedroom . . . ." [Doc. 36, p. 43, 59]. No officer testified that Lt. Graybeal's intrusion was in the nature of a protective sweep.

The United States has not shown "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on

the arrest scene." This case is not *Buie*, in which officers were in the multilevel home of an armed robbery suspect and where the district court observed, "The man comes out from a basement, the police don't know how many other people are down there. He is charged with a serious offense." *Buie*, 494 U.S. at 328. This case also is not *Bass*, in which officers were inside an apartment searching for an unknown shooter who had "fire[d] several gunshots at two other men." *Bass*, 315 F.3d at 563-64. The government has not met its burden of proof, and the firearm will be suppressed.

## D. Defendant's Statements

The court must address one final issue which the parties did not pursue before the magistrate judge. The defendant's motion asks for suppression of not only the firearm but also "any statements made by Mr. Gregg before, during, or after the search." [Doc. 22, p.1]. Beyond that introductory request, the defendant has offered no further development regarding his statements – neither in his briefing nor at the evidentiary hearing.

For example, the defendant has cited no authority supporting suppression of statements made *prior to* the unlawful search. More critically, the defendant has identified no statements made by him during or after the search, nor can any such statements be found in the record.

It is certainly conceivable that the defendant may have spoken during or after the search. This court, however, does not issue suppression rulings based on speculation. Therefore, the defendant's motion will be granted only to the extent that the

firearm will be suppressed. Because the defendant did not develop the issue of his statements, his motion will be denied on that point.

*IV.*

*Conclusion*

For the reasons provided by the magistrate judge, and for the additional reasoning stated herein, it is **ORDERED** that the defendant's motion to suppress [doc. 22] is **GRANTED IN PART**, to the extent that the Conquest, Model MKV Germany, 12 gauge shotgun discovered during the search of the defendant's home is suppressed. The suppression motion [doc. 22] is in all other respects **DENIED**. The United States' objection to the R&R [doc. 37] is **OVERRULED**. This case remains set for trial on July 24, 2014, with a plea deadline of July 10.


**IT IS SO ORDERED.**

ENTER:


                                                    s/ Leon Jordan
                                        United States District Judge